and Dowd, 23-6440, 23-6474, and 23-6879. May it please the Court, John L. Wood for Dr. Andrew Dowd. This Court should reverse because either of the pretrial errors or any of the three evidentiary errors would, standing alone, warrant reversal. But subject to the Court's questions, given the shortness of time, I plan to spend about one minute on the recusal issue and then spend the rest of the time talking about the prejudicial effect of the evidentiary errors, particularly the testimony of Tara Arce. At two sentencing proceedings for earlier defendants in an earlier case that were 18 months apart, meaning we're not talking about an offhand comment or a momentary lapse of judgment, Judge Stein urged the prosecution to bring or to continue the investigation of the case into the corrupt doctors and corrupt lawyers based on the testimony he had heard. Then again on a second proceeding 18 months later, he not only repeated his hope that they would do so, but referenced other conversations he had had with the prosecution during the trial and other proceedings of this case, apparently a warrant proceeding perhaps. It's our submission that any judge who cares enough about the investigation and prosecution of a case to repeat it three times to the prosecution, at least three times over the course of 18 months, should not preside over the case. Anybody who cares enough about essentially the government's investigatory and prosecutorial business, I think there's at least the appearance that they might then care about whether he's convicted or not. And I'd point the Court to the Murchison case where the Supreme Court said any judge who's involved in the accusatorial process cannot in the nature of things be wholly disinterested in the conviction or acquittal of those accused. And I want to point out particular language. They say that it's not that they think the judge will have as much zeal as a prosecutor, it's that they can't say they won't have any of the zeal, which is what they got to have, none of the zeal. And any judge who cares enough about the prosecution is firmly enough convinced that there's a guilt there, that they want the person investigated, and at that point, because the government was already investigating them, prosecuted, cannot, should not oversee the case. The government decided no- I'd like to look at the whole record in the case to try and assess this argument, and among the factors that are pointed out by the government is that Judge Stein was speaking about the government pursuing higher-ups in a scheme, given that it had lower-level folks in front of it. It never suggested that it go after any people in particular, and certainly no one by name. That's one. Number two, when the defendants came before the court, the court always made plain that the government bore the burden of proof, and that's reflected not only in remarks made coincidentally, but specifically in its charges. And finally, we are dealing with a case in which when the court sentenced your client, it gave a considerable sentencing departure from the guidelines. Why wouldn't a person familiar with this totality of circumstances not have a- or have no reason to question the judge's impartiality? Well, the sentencing transcript is- or the sentencing came at the end of the entire trial, so it may be that he changed his mind over the course of it. And again, we don't have to actually show actual bias, we just have to show the appearance that the impartiality might reasonably be questioned. Well, but as a person familiar with the totality of circumstances, how would a reasonable person view this? Because the testimony was overwhelmingly about Ribeiro and Dowd, when they're talking about- when he talked about corrupt doctors and corrupt lawyers, when he talked about upstream people, he said specifically corrupt doctors and corrupt lawyers. There weren't that many doctors or lawyers you could be referring to. It was Elephant, Constantine, and the lawyers, and Dowd and Ribeiro as the doctors. Those were the ones mentioned again and again in the testimony. And you know, the sentencing at the departure comes at the end, again, we- it doesn't mean that it couldn't have had an effect throughout the process, and you're reviewing the decision as of pretrial, when we made the recusal motion. So I think all of that together, and again, the government has cited no case where a judge has said things like that, because it's quite a remarkable thing for a judge to say, and still been allowed to preside over the case. So the reason why I said it was one minute is you either believe it or you don't, but I think that it is quite a remarkable thing for the judge to have said, and then after he said, I care enough about the investigation of these people, to then say, oh, but he's not going to have any opinion about whether they're convicted or not. I think that there's at least the appearance that that person should not be presiding over the case. Proceeding on, and I also want to note that this Court has said in the Reitman's case that in close cases, the balance goes in favor of recusal. Moving on, the improper testimony, I think, warrants reversal. An error in the admission of evidence may be deemed harmless only if it is highly probable that the error did not contribute to the verdict. And I don't think you can say that here, because the judge, in bonding our clients out pending an appeal, he said he thought our arguments were lousy, he thought we were going to lose on them. But even he said that an appellate court could find that the cumulative effect of those errors was to improperly influence the jury as to an essential element of the offense. The defendants acknowledged that the scheme was fraudulent and could thus warrant reversal or a new trial. For a couple of reasons, I thought that Dowd, in particular, was vulnerable to prejudice from what we say are the evidentiary errors here. First, he was the only defendant convicted entirely on circumstantial evidence. He was the only person in both trials who there was no direct evidence of his involvement in the scheme. Secondly... That's enough. So why should that factor into our consideration? Well, the court has said in cases... If the law is well established, you can be convicted. And there's a fair amount of circumstantial evidence in this case. It's not like there's just one piece of it. But the court has said, in cases like Galen, that when there is no direct evidence, that they're more likely that the improper evidence will play more of a role. In addition, I think the G cases, Galen, Greenidge, however you pronounce it, and Garcia all point in the direction that the error would be prejudicial because in Greenidge, it goes to the heart of the matter. Go ahead and finish your thought. It goes to the heart of the matter. And then finally, third, in Garcia, the court emphasized both how much the government made of the improper evidence and the fact that there was direct evidence of involvement. But you know, circumstantial evidence comes in a lot of different types. And there's evidence here... Some of these patients testified, right? I'm sorry, can you repeat that? Some of these patients testified? Five patients testified. And some of whom identified... There was one patient that testified that didn't even have an injury? Well, everyone testified that they... Well, he testified... He had an injury. He was one of the people who actually had a knee injury. Two of the five had actual injuries. All five of them had positive MRI reports. And actually, four of them wound up actually having tears in their knees. And Dr. Dowd correctly said that there's only degenerative wear on the fifth, which as Tara Arce said, reduced the settlement value of the claim. And that's not something a conspirator would do. It kills the value of the claim. I want to talk about Malik Walker's testimony. I think that the record reflects that the only person who believed Malik Walker's story was Malik Walker. If you look at the record, Walker testified that he told Gordon about it. Gordon testified for a long time. There was no subject too small to have Gordon corroborate. The body odor of patients. The fact that some patients smelled like pot. And yet there's this fantastic evidence that he was offered that Dowd said, I won't do surgery. I'll just give you a nick on your knee. And they don't ask Gordon about that. They don't ask Kalkanis. The government introduced their entire case through Gordon. And then they did it through Kalkanis again. Never mentioned it to either of them. And then the 3500 material... And what's the point of your highlighting that? Because if the government believed it, they would have asked Gordon about it. But what is the error that you're linking that to? Because I just don't think that that is a piece of... I don't think that's evidence that would have meant that they would have convicted Dr. Dowd anyway. So is that part of a sufficiency challenge? No, we aren't raising a sufficiency challenge. We're only arguing... So what is the... Which part of your argument do you want us to consider this... That the error was not harmless. The evidentiary. The evidentiary was not harmless. That the circumstantial evidence... Well, but you're not talking about what the alleged evidentiary errors are. As I... If I understand them correctly, you're complaining about the district judge allowing medical ethics testimony and allowing evidence that Dr. Dowd underreported some income. Am I right about that? Right. And there's also the evidence that they improperly admitted the evidence of Tara Arce, who was not qualified as an expert, who testified to... Let's deal with those errors before we decide... Before we talk about other evidence. With respect to the allowing the medical ethics testimony, there's a basis in the record to think your client opened the door to this by talking about how well he took the payments by check, not cash. And the court allowed it in on that basis, but also gave a limiting instruction on it. So how is that quite apart from the other concerns you're raising? How is that prejudicial in a way that gets you relief from verdict? I disagree that that's the basis on which the judge allowed it in. Because the government argued it on that basis, but that's not the basis on which the judge allowed it in. The judge allowed it in on a relevance ground. Because trial counsel in opening... Because there was... He didn't say... ...about whether since your client paid by check, no harm, no foul here. And the point the government then made was that payment in any form for this would have been something that a doctor knew couldn't be permitted. On the door opening argument, the point in opening was merely that he paid everything by check, which is a sign, as opposed to the other people in the conspiracy, paid by cash. Well, that's your argument. But that's not the door opening. It's unethical to pay at all, is the government's argument. But proceeding from the door opening argument to the merits, we think it's still error because there was no testimony. He was allowed to testify just that referral payments were unethical and could get him barred. However, he did not address what we think is the relevant issue, which is that payment of management fees, which is how these were couched repeatedly. And unlike just a referral fee where it's just send me the cases and I'll send you money, there was a thought that Calcanus was actually arranging for rides for all of these people and arranging all of these other things. You can say that's not something the doctor should be paying, but there's no showing that a fee that is paid for actual services, as opposed to just for the referral, is unethical. And yet the testimony and the instruction allowed the jury to conclude based on that that he would have known that he was doing something wrong. That's the problem with all of these evidentiary errors is they take a case where, you know, there's substantial evidence that Dr. Dowd just thought, the conspirators came to Dr. Dowd because they thought he was the kind of doctor they wanted and that he had a high volume of practice. He was not reluctant to use arthroscopy because he considered to be an appropriate diagnostic tool. And they allowed him to say, aha, look at all of these warning signs. But I do want to point to also all of the evidence that Dr. Dowd, or that the conspirators didn't believe he knew and that he didn't believe he knew. Because the conspirators, Calcanus talked to every one of the conspirators about the traveler's investigation. It's undisputed he never talked to Dowd about it. There were group-wide emails of all the other conspirators, including Dr. Ribeiro, talking about business with headings like read and delete and erase this email, joint appendix 803 and 1288. He was not included on those. There's the fact that, again, he reported, he told his accountant about all of those things and they were put on a tax return as professional services. And as I previously said, there's no dispute that he, when there was only degenerative wear in the knee, he reported only degenerative wear, which Tara Arce, JA 1146, admitted reduces the settlement value because it shows that they weren't hurt by the fall, or the purported fall, but they were hurt by just being old. So, again, there's substantial evidence that they would have just thought he was just being himself, that they came to him because they knew what kind of doctor he was, and that in order to convict him then, the government needed other evidence to indicate that there were, you know, warning signs that he should have known about. Because, again, he was convicted on the basis of conscious avoidance. And that's where I think Tara Arce's testimony is particularly damaging. Tara Arce, I'm sorry? So, I'll give you one more minute, and then we'll hear from your friend. But Tara Arce, you know, she was testifying to stuff that was beyond her personal perception, that was not based on the reasoning of an ordinary person, citing Garcia, and that's... Your concern is that she used the term red flags? Well, yes, exactly. And not only did she use the term... But she testified to what it was she saw that prompted that characterization. So, to that extent, I don't see how you're prejudiced. I disagree. Because she said, they asked her, and she said, you know, in your experience, calling on the 25 years of experience, are there certain things that you have identified that could raise concerns about personal injury cases? She was talking about her ordinary practice, not just this case. And she said, we call them... Well, she testified that there were unwitnessed accidents, similar providers, funding companies use, and the judge gave a limited instruction regarding red flags. But my point is, how are you prejudiced by a conclusory or the use of some word that has meaning to experts when she explains it? Again, I'm not suggesting whether she should or shouldn't have been allowed to testify to that. I'm asking how you're prejudiced by it. Well, she said, we call them red flags in the industry. And they were not based on a personal perception. There were things like operating without sufficient physical therapy. That's not based on the reasoning of an ordinary person. Use of financing companies, not based on the reasoning of an ordinary person. Repeated use of the same doctors, again, not based on the reasoning of an ordinary person. They elicited testimony to say that they saw patterns and that they were associated with fraud. Now, the problem is, once you say these are, you know, red flags of fraud, that then they say, not only did she say, we saw them in this case, that question, that answer alone was struck by the judge. But after you've set up the checklist of red flags of fraud, then the government went through and said, and flagged each of those red flags in each of the cases, and every time it came up, and each of those times they're telling the jury, see, these are warning signs that Dr. Dowd said, so he would have known it was fraud. She was offering, quote, expert testimony, end of quote, with regard to all the conclusions that the jury was supposed to draw. She was usurping the function of the jury in that context. Yes, that is our argument. But, I mean, even if there was wiggle room in between there, she was offering expert testimony that was obviously damaging. The government emphasized, unlike in Garcia. An insurance company's perception of fraud might be different from the way a doctor might get a patient who walks in and has an injury. The ideology of the injury, other than a brief description of it, is irrelevant to the doctor beyond, I mean, whether it was witnessed or unwitnessed, whether they threw themselves down the stairs or not. The fact that the patient presents an identifiable, quantifiable objective injury is able to be understood by the doctor. So, is the doctor supposed to be held to making sure that the patient's telling them the truth? That's the argument we made. That's an argument that was available to us, but it's the second best solution once they've admitted improper expert testimony. Well, that's the problem with Iris' testimony, isn't it? Because she seems to be identifying that, well, this is how you understand whether fraud occurs. And it seems to me it's separated from what the way a doctor might perceive or come to appreciate that he or she is participating in a project scheme. Because knowledge and intent is really the cornerstone to your defense, correct? That is exactly right. But the problem is that it's a second best solution when you can always argue that improperly admitted testimony wasn't known to your client. But the government just was able to harp again and again, and it emphasized again and again even in closing, unlike in the Garcia case. Well, that's because of the red flags in the conclusion. The nine or ten categories are things that people... It was among the nine categories, although if you look at it, it was really more like eight because the same category was repeated twice. And one of the three improperly admitted testimonies was used twice, so it was really about half of the categories. Any more further questions? We do reserve some time for rebuttal, so we'll hear from Mr. Constantine. Good morning, your honors. May it please the court, my name is Donna Aldea and I represent George Constantine. I'm not going to repeat what was already argued, but I'm going to piggyback on it and instead talk about the impact that these same errors had on George Constantine. And I think that those errors in many ways are different. So I'll start with the last question that Judge Wesley asked, which is, well, isn't the perception that a doctor might have as to what these red flags are different than the perception of the insurance company? I'm not going to pine on that. I'll let my co-counsel discuss that point, but I will say that it's not different for a lawyer. And that's the problem with how this impacted George Constantine in part. The red flags that Tara Arcer, I'm not sure how to pronounce her name, identified, were red flags, first of all, that she clearly gleaned as an expert. She was an expert in sheep's clothing or an expert in layperson clothing, but she was an expert. That's how the government established her credentials, by talking about her history, identifying fraud both in law enforcement and in the private sector. And then when she identified these red flags, she didn't talk about what she saw in a particular case or in this particular case. She talked about there are things that insurance companies look for to determine whether there's fraud. And the detriment to Constantine was that those same red flags, on summation, were used by the prosecutor to directly link them to what Constantine would have known, should have known, and if he had not consciously avoided knowing, would have seen in this case. The only issue that was material here, according to the prosecution... I have a hard time appreciating how the insurance industry's broad investigative techniques morphs onto a criminal statute with regard to a fraudulent scheme of presenting claims to the insurance company that themselves are fraudulent. I mean, why is it that it's the insurance standard that decides this? And what's the relevance to the jury's conclusion of hearing testimony from people that say, well, the lawyer told me a lie about how I got hurt. And then the lawyer sent me to the doctor. And the doctor really didn't examine me. And then the doctor just ordered a thing. And I got paid money for it. The lawyer told me I get paid money for it. I don't understand why the insurance industry has to become the thermometer of fraud here. I agree. I mean, that's why her testimony should have been excluded in the first instance, which was the first error that the court made. Because this evidence should not have come in in the first place, for a whole host of reasons that were argued below, including relevancy, as Your Honor said, including the fact that she was an expert, and it was not properly noticed and not properly admitted, and including the extreme prejudice. Now, the prejudice here was, for Constantine, exacerbated, not only because this went to what the sole issue was. This was, I'm taking from the government's summation, who actually said that knowledge and intent, were, quote, what this case boils down to. This is the prosecutor's own summation. So this was the key, and this is what she supplied, and this is what the jury allowed, what the court allowed the jury to consider. But the worst part of it here is our next claim, which is that in Constantine's case, not only was this improper testimony admitted and allowed to be used, bless you, Your Honor, but on top of that, on top of that, Constantine's hands were tied behind his back, because he was not allowed to present defense witnesses to address this very evidence. And that was actually, in three ways, this happened, the preclusion of the defense. The first is, he was not permitted to elicit the testimony of clients who would have testified that their cases were legitimate, despite having the same red flags that had been identified by Tara Arce. Now, the court claimed, and the prosecutor argued, that this was good acts evidence. But it was not good acts evidence, because it was not proffered for that reason. This was proffered to directly contest that these red flags are indicia of fraud. In other words, to directly meet the government's attempt to make that relevant, to make these red flags relevant in this case. The second thing is, the defense was precluded from offering a testimony of an attorney who took over Constantine's cases after knowing about the fraud, after knowing that he was under investigation, and who investigated those same cases that bore the red flags that she had identified, and who not only took those cases, despite those red flags, but settled them with Tara Arce's own company, Travelers, successfully getting a substantial settlement. And one of the cases actually wound up going to trial, but he would have testified that most of those cases resulted in favorable dispositions. The government and the court found that this was, quote, irrelevant. I cannot think of a more relevant thing in this case to rebut the testimony that the government itself put in. And I will note that the court's error... How is the view of the insurance company, which could be settling for various economic reasons, or even of another lawyer, how is that probative of your client's state of mind? Relevance has to do... It can't be viewed in a vacuum, but it's based on the context of the case. So in this case, the government made it relevant, because what the government did is it argued that these red flags were such obvious indicia of fraud that Constantine, or in fact any person, would have looked at them and would have said, I have knowledge, right? And that's why. Because it directly rebuts the credibility, I guess, of Tara Arce's testimony to that effect. She testified all these cases have red flags. So the point is that if the red flags were so evident to travelers, why would travelers settle for something where red flags are all over the place? Correct. And if they were so relevant to any attorney, then the fact that another attorney took them and successfully litigated those same cases with the same red flags was very probative. So you can't look at it in a vacuum. The government made the issue relevant. The court made it relevant by improperly admitting Arce's testimony. But once you do that, you have to let the defense counter it. It wouldn't have been relevant if the court hadn't let her in. But once he did, it becomes relevant. Am I wrong? So Judge Stein gives an instruction. Is that correct? Correct. On the red flags. Correct. So what are we to make of that? The instruction that Your Honor is talking about is- On 888. I don't have it in front of me. I will allow that. But ladies and gentlemen, earlier in the answer, part of the answer was that there were red flags on the claims. I'm directing the jury to disregard that part of the answer. Yes, Your Honor. But that was only for that one context. And in context there, it was, while the instruction was given disregard that part of the answer, in later portions of Arce's testimony, she did testify to red flags again. And the government picked up on that on summation and used the reference repeatedly. Were there objections then or requests for further instructions? No, Your Honor. There were not. So how do we review that? I mean, why wouldn't we think that the defense was satisfied with how the court had dealt with it initially? Because the defense had objected to the admission of her testimony in the first place, had asked for the ability to call witnesses to rebut it, and had asked also, my last point, was asked for the ability to cross-examine her on the fact that her own company had ultimately rejected this red flag. Now, I will say this. I'm not hanging my hat on the catchphrase red flag. That's not what this is about. This is not about the words that were used, which I think is how the district court interpreted it. This is about the content of the message that she was giving. So call it red flag, call it blue flags, call it purple flags, it doesn't matter. She was saying, this is indicia of fraud, and this indicia would have been obvious to anyone, anyone, and therefore was obvious to Constantine. That's the harm here, and the district court did not preclude that. It was offered as evidence that the defense were knowingly participating. In fact, that's how the prosecutor closed. Exactly, Your Honor. That day, 26-52. Exactly, Your Honor. And so this is the prejudice in this case to Constantine, which was extreme in light of the way that he was limited. So those were those three errors. The next thing is that the court also erred in this case substantially by instructing the jury on York's rule of professional conduct prohibiting referral fees. And here's what's interesting. In the first issue that I argued about Tara Arce, the court failed to recognize the nexus that actually did exist between what Constantine wanted to do to rebut that evidence and what the relevance was. In this case, in this instance, the court made the opposite mistake. In this instance, the court automatically said, well, you're allowed to put in instructions about ethical rules, but the court failed to recognize that this particular ethical rule, as it applied to Constantine about referral fees, had no nexus whatsoever to the salient question of his intent and of his knowledge. And that was the problem. I'm not saying that a court can never instruct on ethical rules, although this court has never held. I think that a court can do that in the absence of evidence. So I think that that may actually be an issue, too. But I don't even know that the court needs to reach that issue here, because I think the more pressing issue, the more obvious issue, is that here, referral fees are prohibited, regardless of whether or not- If somebody, from one of the upstate bills that does the negligence cases, from one of those firms, pays referral fees to someone who's got a good, decent negligence case, that's inappropriate, too. Absolutely. I have a hard time appreciating the connection between the ethical violation and a conclusion of knowingly participating in a fraudulent scheme. It's not the purpose of the ethical rule. Absolutely. Couldn't have put it better myself. That's exactly the point. There was no nexus here. And I will note that the court's instruction here was devastating, because the court's instruction, which notably was not a freestanding instruction, but was sandwiched immediately between the instruction on conspiracy and aiding and abetting, that instruction said that such proof, in other words, proof of this particular ethical violation, 7.2, may be considered by you in determining whether Constantine engaged in a scheme to defraud and whether he did so with knowledge and intent. This was devastating. It allowed the jury to take something that was wholly irrelevant, an ethical violation that had no nexus whatsoever to whether there was fraud or whether there was knowledge to deceive, and to use that to furnish proof of the only element, according to the government, that was actually, in this case, in dispute. So for those reasons, Your Honor— Did the jury seek an instruction about any kind of fraud on the courts or the responsibilities of trial counsel to not present evidence, the fraudulent evidence, put fraud on the court? Did they seek ethical evidence with regard to that and an instruction on that? So the government didn't, but interestingly, Constantine sought an instruction here, which would have been a comparable instruction that should have been admitted if this one was— With regard to the evidence of the attorneys who worked the cases post? Well, specifically, this one was with regard to his obligation to zealously represent his clients, which came into—the reason that was relevant was the government had introduced evidence through an attorney that testified that Constantine, at a deposition, sought to block his client from talking about a video that showed or seemed to show that he may have staged a slip and fall. So the government used that as evidence of the fact that Constantine must have, you know, tried to block that because he knew that this was fraudulent. Now, you've gone and—obviously, I'm sympathetic to some of the things you've said, but there was a lot of evidence here about Constantine's involvement here. What do you say to harmless? So with respect to harmless error, I think that you have to look at the question. There is—I will say this. There is overwhelming evidence in this case of fraud. There is overwhelming evidence in this case that this was a scheme that was perpetrated. What there is not overwhelming evidence of was the fact that Constantine knew or should have known about this. And in that regard, the reason for that is that every single one of the witnesses that the government called, the government's own witnesses, testified that they lied to Constantine. That when they met with him, they specifically lied to him and gave him a story that they had actually slipped, they had actually fallen. Now, when we talk about a lawyer's ethical— Because the rehearsals occurred with the runners as opposed to Constantine. That's correct, Your Honor. And in fact, all of the runners, with the exception of Kalkanis, testified that—and even Kalkanis on this point, actually— testified that not only did this occur outside of Constantine's presence, but that they themselves never told Constantine that these stories were fabricated. So this was a lawyer who— Now, I'll also say that on that point, there was testimony— If we look at the numbers here, Kalkanis estimated that he had brought somewhere upwards of 1,000 clients to Constantine, but the government ultimately determined that he only took— or Constantine only took about 200 of those cases during the period. If that's so, then Constantine must have rejected, I guess, at least 800 or 80 percent of these cases that were given to him just based on the numbers that were in the evidence introduced at trial. So Constantine certainly rejected cases that he thought were fraudulent, and there is evidence to back that up, or at least he rejected cases on some grounds. So when we look at this, there's nothing to indicate here, aside from Kalkanis's own testimony, that Constantine knew about this. Why isn't that enough? The reason that that's not enough, Your Honor— and I'm not going to address this in terms of sufficiency, although I did that as well, but in terms of harmlessness— the reason that's not enough for harmless error analysis is because Kalkanis in this case was, first of all, was probably the most incredible witness that testified here. His story changed constantly. He had a record of having lied under oath multiple times. He had perpetrated similar frauds well before he became involved with this particular scheme. And on top of that, Kalkanis himself never gave an answer to the operative question here that I think should have controlled a reasonable determination of the issue, which is, if Constantine was in on this fraud with you, why did you lie to him? Why did every person that go into that room give him a story that was a lie? Why did your runners lie to him? Why did they perpetuate the lie? Because there is no answer to that question. There is no answer to that question. If he was in on this scheme, there would have been no reason to prep the witnesses before they met the lawyer to give a fake story to the lawyer. And I understand that the witnesses may have speculated that everybody knew about this, that everybody was in on this, but they all lied to Constantine. That's why, for harmless error analysis, this Court cannot say, safely say, that with the errors that occurred here that bore directly on Constantine's knowledge and his intent, and with the fact that a conviction was permitted in this case, not even based on actual knowledge, but based on the fact that he should have known, based on the fact that he would have known, this is a conviction that this Court cannot safely say was not impacted by these errors. You've also reserved some time for rebuttal. Yes, Your Honor. Thank you. Good morning. Good morning, and may it please the Court. I'm Alexandra Rothman, Assistant United States Attorney in the Southern District of New York. I tried the case below, and I represent the government on appeal. Judge Leslie, I'd like to address Your Honor's questions about Chair Arce's testimony, as well as the referral fee's testimony. But maybe I can start with Your Honor's last point. There was an overwhelming amount of evidence of the guilt of both defendants, Andrew Dowd and George Constantine. Well, that gets to whether errors were harmless. Why don't we talk about whether there were errors first, and how much we have to ask that evidence to bear? Yes, Your Honor. So there were no errors here. Judge Stein carefully considered the parties' arguments, and correctly admitted the evidence that the defendants challenged. On Chair Arce, her testimony was relevant, Your Honor, because she was a fact witness for an insurance company that was a victim in this case. There was testimony from Kerry Gordon and Peter Kalkanis about the traveler's investigation. Was the conclusion that the files were indicative of fraud a fact? Your Honor, she never concluded that there was fraud in George Constantine's cases. Well, she talked about red flags of fraud. I mean, she got as close to saying it was fraud as you could get without saying it's fraud, didn't she? Your Honor, I disagree. I think what she did is explain what an insurance company does, how they got involved in this case, the things she looked for, and the things she did. How is that not expert testimony? Well, Your Honor, she was a fact witness. She talked about what she did. She went to- Well, she didn't talk about the files in this case. Indeed, that evidence was struck when there was a question about whether it was seen in this case. My understanding of her testimony was she was testifying generally that insurance companies, when they saw unwitnessed accidents, similar providers, funding companies used, that alerted them to be suspicious. Did I misunderstand why she was testifying? Well, Your Honor, I don't think that's why she was testifying. That was what was elicited, and the purpose was to tell people, if you want an inside look into what insurance companies do, buy an inside, this is what we do, and this is what we're suspicious of. Your Honor, she explains the things that insurance companies look at. How is that not expert testimony? Your Honor, I don't think it was. If the court- It's being offered to provide the jury with information outside the canon of an average person. It would be like asking a chemist, when they see a certain reaction, whether they are alerted to something. It would be like asking anyone in a particular field to provide us with the expertise they have in that field. Your Honor, many of the things that she identified as red flags were within the canon of an average person. For instance, not filing an accident report at the scene of the location where you claim to have fallen, like a gas station, that's a common sense red flag for the case. Not obtaining medical care immediately after, I don't think it takes a science degree or advanced training to know that that's a red flag. Well, then that gets to the question of why you needed her to testify to it. Well, Your Honor, she explained the traveler's investigation. How she got involved, what she did, what she saw, and how this case ultimately got referred to law enforcement. I'm sorry, did she testify that any of the materials pertaining to Dr. Dowd and Mr. Constantine's referrals indicated this? She gave one or two lines in which she explained in looking at the 41 Constantine cases, and I want to just emphasize that point, because she had barely anything to say about Andrew Dowd, which raises the question why we're hearing argument from Mr. Dowd's counsel about how prejudiced he was from her testimony. I think it's because then the government argued, you heard her testify that A, B, and C were indicative of fraud, and then the government argued to the jury, you see these records, you see A, B, and C, and she just told you that's indicia of fraud. I think that's the argument of the defense. And Judge Raggi, respectfully, the government's argument in summation was different. So looking at Joint Appendix 2700, here's what I said. The patients were asking for money. The patients were coming from shelters. The patients were disappearing. Patients were being in jail. Everyone's getting surgery from these trip and falls. MRI scans that don't match the surgeries. Bright red flags that Dowd and Constantine cannot ignore, cannot bury their heads in the sand. Those were not the red flags that Tara Arce mentioned. Those were the flashing red lights, suspicious signs, pick whatever word your honors would like, I'll give you craft person-ship with regard to the argument. I won't hold that against you. But here's the point. What Tara Arce is saying, the small sliver of testimony she gave in no way prejudiced Andrew Dowd or Judge Constantine for the following reasons. If there was an error, and I don't think there was. First, it was so small. Second, there was overwhelming evidence against these defendants. Third, the judge offered the defendants twice a limiting instruction. He even gave them the language he proposed he would use. He did it when he ruled it would come in. He also offered that before she got on the witness stand. We had a sidebar where Judge Stein went over the rules again and he said, I will give a limiting instruction. Neither of them asked for that. And you know the reason why. Because this testimony was in no way prejudicial. They didn't want... Well, you say that the evidence was overwhelming. I think the defense clarified for us just now, Mr. Constantine's attorney, that they're not disputing that there's a fraud here. What they're disputing is your ability to prove that Mr. Constantine knew about it. And to that extent, the argument as I heard it, is that you just had somebody indicate that these factors are indicia of fraud. Then the government argued, I'm looking now at page 2689 of the record, that you saw those indicia in Mr. Constantine's cases, and that that's how you proved that he knew that this was fraudulent. Then they argued that they weren't allowed to put in other evidence that would have indicated to the contrary. Why don't you tell us what was the overwhelming evidence of his knowledge? Yes, Your Honor. Turning to Mr. Constantine first. You had two cooperators testifying that he was the lawyer, the main lawyer, that they brought cases to, patients or clients by the carload coming to his small office in Queens. Peter Kalkanis, the master fraudster, is sitting in the basement of his office, meeting with the patients first, sending them upstairs to meet with Constantine. Constantine's intake appointments were 10 minutes max. Malik Walker, the patient with the scar testimony that Andrew Dowd brought up, which I'll address in a moment, he said he didn't ask him any questions, not where he fell. He didn't even have an accident location at the time of his intake appointment. That is proof of Mr. Constantine's knowledge of the fraud. There's testimony from Peter Kalkanis at Constantine's appendix at 1803 that Constantine learned of the traveler's investigation and said, F them, and for years after, kept participating in this scheme. You heard from three Constantine patients, Walker, Kashim Jones, Dexter Baldwin. You saw and you read the deposition of Jose Juleby. That was devastating testimony against Mr. Constantine. You heard from Paula Trujillo that she got a video of a staged accident, sent it to Constantine, and Constantine did basically everything except throw the court reporter out of the deposition to prevent his client from answering questions about that video. And then he kept pursuing the case for another year. So respectfully, Judge Radji, there was overwhelming evidence of Mr. Constantine's knowledge and intent at this trial. And the same is true for Dr. Dowd. I was just, fill us in, because Dowd has no reason, I mean, Dowd, the evidence we've regarded Dowd as problematic, is it not? Because why does Dowd care, whether, I mean, Dowd cares whether, that his patient's injured, but does he have to fully believe how the injury occurs? Your Honor, Judge Leslie, Andrew Dowd cared about one thing, the proof at trial was. And that was getting $10,000 per patient for performing surgeries on patients. Is it illegal to want to earn a living? Well, it is illegal to commit fraud. It's illegal to know that your medically unnecessary surgeries are being used to inflate the value of lawsuits. And he knew that because he saw the funding company checks that he got. And here I want to talk about Erica Barton and Malik Walker. Those are the two patients that Andrew Dowd explained or argued to the court were patients who actually had knee pain. So maybe Andrew Dowd was fooled. Let's be clear about who Erica Barton and Malik Walker were. Erica Barton had surgery from Andrew Dowd six days after she met him for the first time, even though her medical records suggested a one to two week conservative care treatment. He got the check from the funding company before he even saw the MRI. So, Judge Wesley- Does the record reflect that someone else said that that was inappropriate medical care? I mean, I think there's common sense that if the surgery is being decided because the check's been issued before you even look at the MRI that suggests surgery is necessary, there's a common sense understanding. I'm just asking a question. Was there record evidence that said it was inappropriate medical care to perform surgery without the MRI? Yeah, Dr. Roth, the government's expert, did testify to that. Yes, Your Honor. Not every question is a hostile question. And of course that makes sense. And thinking about this, these are hundreds of patients who are coming and claiming I tripped and I fell and they're having surgery within one to two weeks. How many patients of Dr. Dowd testified? Five? Five patients testified that had Dr. Dowd as their treating physician. And how many of them had identifiable injuries upon which the government's witnesses agreed they actually had injuries? Zero, Your Honor. Zero. At Constantine Appendix at 498 and Constantine Appendix at 973, Erica Barton and Malik Walker said they had surgery for the money, not for any knee pain, for the money. Malik Walker's the patient who Andrew Dowd offered to give a scar to because of his overweight, high BMI levels. That is overwhelming proof, amongst the other evidence we offered at trial, of the defendant's knowledge and intent. Okay. May I ask you about some of this evidence in the context of an argument that wasn't really pressed here today, but it has to do with your giving particulars. And if you wouldn't mind looking at count two of the indictment, the substantive mail fraud count, it alleges that from in or about January 2013 up to and including April 2018, there was a scheme to defraud and they did place in a post office materials. I'm unfamiliar with a substantive mail fraud count that spans five years. How many mailings are we talking about in that period? One? Well, Your Honor, there was evidence at trial. No, no. Let's stay with the indictment. What's being charged in that indictment? How many mailings? Your Honor, I think it's a continuing scheme of sending mail. How do you know the substantive mail fraud count spanning five years and multiple mailings? Your Honor, the way we charged it, I hear the court's question. How we charged it was on the theory of a scheme where they, during the course of that period of time, were routinely selling mailings. You're charging substantive mail fraud. I mean, there are department policies about not charging more than at one point it was 30 mailings. I don't know what it is now. But I'm trying to figure out what you've charged here and then let's talk about particulars. As I understand it, the defendant asked for what patients were fraudulent claims sent with? And if I understand your response is that half a year before trial they got 3,500 material, including patient statements. Is that where the particulars were provided? Is that your response to how you gave them the information? No, Your Honor. I think they had much more than that. As Your Honor knows, this court has been clear that in Torres the function of a bill of particulars is to provide the defendant with information about the details of the charge against him that's necessary to prepare his defense and to avoid prejudicial surprise at trial. I'm trying to deal with that in the context of a five-year substantive mail fraud count, which I think is subject to challenges. As I said to you, how many mailings are we talking about in this count? Five? Five hundred? Your Honor, I don't think there was evidence at trial of the specific number of mailings. How was the jury supposed to figure out which mailing was fraudulent? Your Honor, we argued in summation. We pointed the jury to specific mailings that we introduced proof of at trial. So again, how many specific mailings was this count supposed to address? Your Honor, I'm not sure this answers your question. I think I pointed the jury to three or four different mailings in summation and they probably saw evidence of several more, many more. But you all should have serious discussions about this. I'm not sure you can charge a substantive mail fraud count this way and then not provide specific information as to, you know, October 10th, 2000-whatever, mailing with respect to John Doe, November 4th, and each of those I think are separate counts, by the way. But in any event, is the jury told that they had to be unanimous as to which mailing? Your Honor, I don't recall standing here today. In any event. But I will, to answer the Court's broader concern, this was not a case where Andrew Dow did not understand the nature of the charge against him so he could defend himself at trial. He knew how the scheme operated. He knew who was involved in the scheme. He received a list of patients from Sunset Management Company, one of the primary funding companies. He received a list of patients that our expert reviewed and was prepared to testify on. He understood full well in advance of trial what this case was about and he was in no way prejudiced. And how many patients were disclosed to him in that way? Your Honor, there were several hundred and we argued that those patients were fraudulent. We argued this was a massive fraud scheme. It was not a needle in the haystack. I understand, but at some point you have to alert the defendant to which ones are going to be the basis for your mail fraud claim. Now as I understand it, the several hundred you identified were not necessarily all proved at trial, nor were they all witnesses at trial, right? Your Honor, they were not all witnesses. I don't think anybody wanted to sit at a trial in which hundreds of patients testified, but we did offer through one of our witnesses, who was from Compass Lexicon, a quantitative analysis of the different patients, looking at the number of patients that saw Andrew Dowd, that saw Sadie Rubiero, that saw George Constantine, the addresses at which they came from, the locations where their accidents happened. And so we did present quantitative information to the jury to conclude that this was not just one or two patients who had fake accidents. This was a massive scheme in which the defendants knowingly participated. I'm not asking these questions apropos of any kind of conspiracy charge. I'm asking them with respect to CalPERS. Okay. I have your answer. I understand. I don't want to take up more of your time. Okay. Your Honor, I'm happy to address the relevance of the referral fee. I will note, again, there was no error. If there were error, it would entirely be harmless in light of the instruction that Judge Stein gave informing the jury repeatedly that the defendants were not charged for any violation of any ethical obligations. The problem I have is that, you know, how do you unring the bell when you talk about someone being unethical? The jury hears that. The jury, how does the jury separate that from some kind of evaluation of the venality of what the, of the conduct of, which is another, I mean, a well, your Honor, Judge Leslie, let me say this. The payment of referral fees was a fact at trial. Kerry Gordon, Peter Kokanis testified to it. Well, that's because that's trying to understand how the conspiracy works, right? Yes. And both defendants argued in opening, there's nothing wrong with paying referral fees. They argued there was nothing wrong with that. Okay, fair enough. And so the response was to show it actually is in fact wrong, and that's where this line of questioning came in. And both medical experts, ours and Dr. Springer, who testified for Andrew Dowd, agreed you can't do this. And so that is, I think, the response to your Honor's question. I'm happy to talk about recusal if the court would like me to. I'll just note, as this court's aware, it is a rare case where a court would discurb a lower court's decision not to recuse itself. That's ISC Holdings AG, a 2012 case. And this is not that rare case. Judge Stein made his statements based upon the trial record. And maybe I'll just end on this. I don't think it's a controversial point that the higher ups, all of them, not just Andrew Dowd and George Constantine, were more responsible for this horrific fraud scheme. You know, the folks who had licenses and medical degrees to then cut into people who didn't need surgery. It was for Judge Stein to say what he did, and it in no way, no way, demonstrated the deep-seated favoritism or antagonism that might justify recusal under the Supreme Court's decision in Latecky. So for all of those reasons, this court should affirm the defendant's convictions. Thank you. I'd just like to make, I think, three points, a couple of them just factual ones. First of all, it's important to emphasize that every one of the patients that Dr. Dowd saw, everyone had a positive MRI report showing that they had a tear up before he saw them. Every one of them claimed that they were injured. And everyone faked being in pain. The suggestion made by the government, though, was that surgery was ordered before Dr. Dowd saw the MRIs. Do you want to respond to that? I'm not sure. I don't think that there's record in the, there's evidence in the record to indicate that surgery was ordered. The patients ordered surgery there. I think the suggestion was that the MRI, that some of the checks were cut before the MRIs were delivered. But the checks were cut early because Calcanus didn't get his fee until the checks were cut. And there was undisputed testimony from Gordon that Dr. Dowd only got his fee on the day before surgery or the day of surgery. And he was the guy who delivered the checks. Again, all that's said about the checks was they were, there's actually testimony, or there's a cross-examination that Keating, Dowd's trial lawyer, did where he demonstrated that all of the checks were cut after the MRIs were performed and that they weren't, and as they say, Gordon didn't deliver them until closer to the surgery. Secondly, Rousman suggested, Ms. Rousman suggested that they, the red flags talked about in the closing weren't the Tara Arce ones. I direct you to JA-2687 where she said, what's the seventh reason why you know this is fraudulent? The obvious patterns of fraud. Two pages later on 2689, Tara Arce testified about some of the red flags that she looks for looking at Tripp and Trauf cases, unwitnessed accidents, late reporting, no incident reports to the insurer, questionable medical records, reports, provider-attorney relationships, and funding company involvement, all of which you saw in George Constantine's cases and the cases that Dowd treated. So, again, it was very much the red flags. There might have been other red flags, but the red flag device that they used in both the closing and in the rebuttal referred back specifically to Tara Arce. Tara Arce's name was mentioned in both the closing and the rebuttal. So, you know, if they don't think it's relevant, why are they saying that? And then, finally, I think, let me see here. I think that that's basically it. I mean, I'm happy to talk about the bill in particular because, you know, there is the Bortnowski case. There was 15 cases that were supposedly where it was unclear which of them were fraudulent. And when you're trying to prove up the conscious avoidance from the medically improper treatments, without knowing which cases are medically improper which are supposed to be fraudulent, you can't there's no point in introducing evidence. You could introduce testimony about how another witness had their knee examined carefully and they were worked up and they said, do you want to proceed with surgery and all of that. And the government would just have to say, oh, that wasn't one of the fraudulent ones. And the value not only disappears, it becomes actually harmful because it shows it makes it suggest that there's different treatment for fraudulent cases versus non fraudulent cases. And the testimony in the first trial was 50 to 80% were fraudulent. So in order to, you know, we would have to prove dozens in order to show no, no, there's, you know, really we're doing medically proper treatments here. So you're almost you're out of time. On either occasion you talked about the restitution the restitution order and or the opportunity that you didn't have to present your concerns to the judge before the restitution order was entered. Do you want to briefly address that or not? I think that the record largely speaks for itself. But the one thing I want to just point out is that there was no record filing. I mean, we were literally just scratching our heads wondering, how do you respond to an emailed request? Because the rules just don't cover it. We're supposed to have 14 days to respond to a motion. And not only did we not have 14 days, we didn't have an on-the-record filing. So, I mean, at minimum we did not receive the minimum increment of due process. It was entered on the 86th day. You did not consent to the restitution order. What's that? No. You did not consent. No, and the government even said we opposed it. But still, on the 86th day, they didn't even wait until the 90th day to enter the order. That's all. We're not asking for a judgment of acquittal. All we're saying is that before you send away a 68-year-old man without a criminal record for eight and a half years we have one opportunity to present to the jury and have them decide, without all of this tainting evidence, decide whether he actually knew that what was going on here was fraud, that he was facilitating fraud, that he was just not operating on people who presented as sick and many of whom were sick. They recruited the injured. Thank you. So the indictment says that these doctors almost invariably recommended that the patients undergo surgery. And you said something about only 50-80% of the cases? The testimony in the first trial was 50-80% of the cases were fraudulent. And even though the government says that he almost invariably recommended surgery, their own spreadsheet at page, I think, J3240 shows that there were 316 dialed patients from Calcanus. He operated on 274. So, you know, trying to know which among those cases are the fraudulent ones so you can are supposedly fraudulent so you can say, no, look, this fraudulent case, you know, we worked it up well, we examined them carefully, you know, we gave this guy medically appropriate treatment. And you can't do that without knowing which cases are supposed to be fraud. Thank you. So just to start by addressing the government's argument on harmless error in terms of the overwhelming evidence of his knowledge. I could address each of the points and will a little bit that the government raised to support that. But I'm going to start with the standard. Because that is what is dispositive here and what the government did not address. An error in the admission of evidence may be deemed harmless only if it is highly probable that the error did not contribute to the verdict. In light of the error in Tara Arce's testimony here and the admission of that evidence and in light of the fact that the evidence that was excluded, that the defense was precluded from meeting that evidence, that high standard cannot be met here. With respect to the jury charge error, again, reversal is required unless it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. That cannot be said here. And I want to point to the fact that the government argued here that there was an instruction so we know that this was not a problem. The instruction that was given here only exacerbated the error because the instruction in this case explicitly allowed the jury to consider a completely irrelevant ethical violation in paying referral fees on the issue of his knowledge. Is it right that you open on the notion that there's nothing wrong with paying referral fees? I think that there was, it wasn't that there wasn't anything wrong with referral fees, it's that it wasn't anything wrong, there wasn't anything wrong with paying people for services and that is true. In other words... I take it that the government's argument is that you opened the door and they were able, in the same way that you wanted to rebut certain things, they were prepared and had the opportunity then to rebut this impression that was left during the opening that paying referral fees was perfectly proper. And they absolutely had that opportunity. They could have elicited testimony but they didn't elicit testimony. They didn't call a single witness with respect to Constantine's case on this issue of whether it was proper or improper. Their own witnesses testified that it was proper in support of the evidence here and then without availing themselves of the opportunity to introduce evidence and allow the jury to make the determination, they asked the court to simply give an instruction that would ensure that the jury would improperly consider this irrelevant factor on the salient issue in this case of Constantine's knowledge. And that's the problem here, Your Honor. Even if the door was opened, the door never gets opened to an instruction in the absence of evidence. The door was opened here to allow them to elicit evidence. They tried through their witnesses, they failed to do so, they didn't call anyone else, and that ends the question of the opened door. And in any event, the instruction here was clearly erroneous for the reasons that we said. Finally, I just want to very briefly address the fact that one comment that was made with respect to recusal, which I didn't argue but I rely on my esteemed colleague's argument on that point. The government started by saying it is a rare case, a rare case where this court would reverse on that type of error. I have to say here that the comments that were made here and the errors that were made here that seem to have infected the court's ability to fairly apply the rules even-handedly to both sides. It gives an instruction when the government requested us to ethics, but refuses it when Constantine requests it. It allows the government to put in an expert to testify about all of these cases, but refuses to allow Constantine to meet that evidence. This is not a case where, looking at the record in its totality as Your Honor opened, this is not a case where you can be assured that this didn't actually infect or the judge's opinion on this case didn't actually infect this trial and that's not even the standard that's required. This is a rare case because it does leave everybody who looks at it in light of those questions and in light of the errors that occurred with a disturbing feeling that maybe this was not an entirely fair proceeding. Thank you.